1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KHADIJAH GHAFUR, | ) | 1:08-CV-01502-OWW JMD HC |
| | ) | |
| Petitioner, | ) | FINDING AND RECOMMENDATION |
| | ) | REGARDING PETITION FOR WRIT OF |
| v. | ) | HABEAS CORPUS |
| | ) | |
| K. EICHENBERGER, | ) | OBJECTIONS DUE WITHIN THIRTY (30) |
| | ) | DAYS |
| Respondent. | ) | |
| | ) | |

        Petitioner Khadijah Ghafur ("Petitioner") is a state prisoner proceeding with a petition for
writ of habeas corpus pursuant to 28 U.S.C. § 2254.

                                  **Procedural History**

        On June 30, 2006, a jury convicted Petitioner of misappropriating public funds (Cal. Pen.
Code, § 424; counts 1, 3, 5, 7, 9)[1], grand theft (§ 487; counts 2, 4, 6, 8, 10, 11), failing to file a state
income tax return (Cal. Rev. & Tax. Code, § 19706; count 12), and willfully filing a false return
(Cal. Rev. & Tax. Code, § 19705, subd. (a)(1); count 13).  See Clerk's Transcript at 1643-44.
Additionally, with respect to counts 1 through 11, the jury found the related felony conduct involved
the taking of more than $500,000 and $100,000 (§ 186.11, subds. (a)(2) & (a)(3); special allegation
Nos. 1 & 2, respectively); that the intentional taking, pursuant to a common scheme or plan,

---

[1]Unless otherwise indicated, all statutory references are to the California Penal Code.

1  exceeded $50,000 and $150,000 (§ 12022.6, subds. (a)(1) & (a)(2); special allegations Nos. 3 & 4,

2  respectively); and that the amount of the theft exceeded $100,000 (§ 1203.045; special allegation No.

3  5). See Respondent ("Resp't") Lodged 1, Fifth District Court of Appeal's April 21, 2008 Opinion at

4  1.

5        The trial court imposed a total unstayed term of 14 years in prison and ordered Petitioner to

6  pay victim restitution in the amount of $630,000.  See Resp't Lodged 1.

7        On April 21, 2008, in its opinion following Petitioner's direct appeal, the California Court of

8  Appeal affirmed the judgment.  See Resp't Lodged 1.

9        Petitioner filed a petition for review in the California Supreme Court on May 27, 2008.  See

10  Resp't Lodged 2.  The California Supreme Court denied the petition on July 30, 2008.  See Resp't

11  Lodged 2.  In addition to Petitioner's direct appeal, Petitioner sought state habeas review, however

12  the claims raised in the state habeas petitions are unrelated to the claims raised in the instant petition.

13   See Resp't Answer (Doc. 20) at 3; See Petition at 3.

14        Petitioner filed her petition for writ of habeas corpus in the United States District Court,

15  Eastern District of California on October 6, 2008.  See Petition (Doc. 1).  The parties do not dispute

16  that Petitioner's state court remedies were exhausted on direct review.  Respondent filed an answer

17  on January 13, 2009.  See Resp't Answer (Doc. 20).  Petitioner filed a traverse on February 17, 2009.

18  See Traverse (Doc. 23).

19                     **Factual Background[2]**

20        The Court adopts the California Court of Appeal's summation of the facts surrounding

21  Petitioner's crime and conviction:

22  ///

23

24  [2]These facts are derived from the California Court of Appeal's opinion issued on April 21, 2008.  See Lodged Doc. 1.

25  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed
to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see Davis

26  v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004); Moses v. Payne, 555 F.3d 742, 746 n. 1 (9th Cir. 2009).

27

28

**PROSECUTION EVIDENCE**

Overview and General Information

During the mid-1990's, Khadijah Ghafur spearheaded the creation of a nonprofit organization called Heritage Development Corporation (HDC), which was developed as a social service organization for the education of Muslim women and children . . . .

In 1996 or 1997, HDC purchased approximately 440 acres in the foothills of Tulare County, near Miramonte, for around $750,000 . . . .

The Miramonte property, which was called Baladullah, came to be home to 30 to 50 families. Concerns about the educational needs of the school-aged children living there led to the development of an independent-study program conducted through Sierra Summit charter school and, ultimately, to creation of Gateway Academy Charter School (Gateway). Gateway's charter petition was approved by the governing board of the Fresno Unified School District (FUSD) in October 1998.

Following representations by Gateway to FUSD that the school was not ready to open because facilities were not ready, Gateway first began to have students during the 2000-2001 school year. It started with 200 students at two sites in Fresno. [Naazim] Hamed had students of his own prior to becoming affiliated with Gateway, and he brought a number of them with him to Gateway. Ultimately, he became Gateway's chief administrative officer. Ghafur, Gateway's superintendent and president of its board of trustees, was his boss.

Hamed recruited other educators to participate in Gateway. One such person was Alfonso Uribe, who became involved with Gateway in spring of 2000, when Hamed asked him to serve as a consultant. Ghafur subsequently offered Uribe the position of chief academic officer/principal, effective at such time as there were enough students to warrant, and a sufficient guarantee of average daily attendance (ADA) funds to support, that position. [FN3] Uribe became Gateway's principal in March or April 2001. . . .

> FN3. Uribe termed the number of students the "life's blood" of a charter school, because the California Department of Education pays ADA money based on the number of students and their attendance. A school receives so much money per student per year to operate the school, but it is not all received up-front. The amount is predicated on the number of days a student is in attendance. If a school were not part of Gateway, Gateway would not be able to collect ADA funding for that school's students. According to Uribe, although it would not be improper for a school to have a list of potential students in order to plan for future operation, it would be improper to have those students included in the enrolled students for whom the school received money.

. . . .

California uses County Offices of Education to distribute monies to school districts and charter schools. Charter schools can choose either to be direct funded, meaning they receive the monies from the County Office of Education, or to receive their funds through their sponsoring school district. The first year, Gateway chose to have money come through the school district. The second year, Gateway chose to be direct funded. Between November 30, 2000 and September 6, 2001, FUSD paid

Gateway a total of more than $1.6 million in public funds, which consisted of a combination of monies received from the State of California and Gateway's share of local property taxes, each of which was based on the ADA that was generated. The first two checks, issued November 30, 2000, and January 2, 2001, were based on the ADA that was projected to be generated by Gateway. In 2001, the disbursements were based on the ADA that was generated in the prior school year, based on actual attendance. In almost every instance, Ghafur came in and Rick Martin, FUSD's director of district financial services, handed the check to her.

Under FUSD's memorandum of understanding, charter schools were required to present a proposed budget to FUSD. They were also required to present projections twice a year, and actuals at the end of the year. The budgets needed to be reasonably accurate. The original budget that Gateway submitted in June for the 2001-2002 school year was similar to that for the 2000-2001 school year and was somewhat less than $2 million. In September 2001, however, there was a meeting about Gateway obtaining a loan. The budget submitted at that time was more than $7 million. Moreover, Gateway's unaudited actuals showed a deficit of approximately $1 million, increasing to about $1.3 million. Thus, Gateway was starting off in a negative position coming into 2001-2002. FUSD would not sign off on any loan without seeing a good plan to know how Gateway was going to make itself solvent again. At some point, FUSD asked for documentation from Gateway on how it would be able to grow to 1,000 ADA when it had been at 250 ADA the prior year. None of the information provided by Gateway allayed FUSD's concerns over Gateway's negative number.

. . . .

[Due to Gateway's failure in meeting FUSD's compliance requirements, on January 16, FUSD revoked Gateway's charter]

### Counts 1 and 2-Payments to Suraiya Razzak

Sometime after February 1995, Ghafur asked Suraiya Razzak, the daughter of a deceased benefactor to philanthropic and charitable organizations, for financial help. Ghafur wanted to obtain a place in Miramonte for battered women and asked for $20,000. After further contact initiated by Ghafur, Razzak agreed to loan her some money. Over time, Razzak loaned Ghafur $132,000.

It was Razzak's understanding that the various monies transferred to Ghafur constituted interest-free loans. Ghafur said repayment would be made from the rent paid by those living on the Miramonte property, and also from the school she wanted to charter there. At first, there was no set time frame for repayment. Eventually, however, Razzak asked Ghafur to begin repaying her. Razzak asked more than once; each time, Ghafur said it would be soon. Eventually, they reached an agreement whereby $5,000 would be repaid each month.

On September 1, 2000, Razzak began receiving periodic cashier's checks from Ghafur that were drawn on Gateway's account. On January 3, 2001, Razzak created a letter for Gateway's board of directors at the request of Ghafur, who said she wanted to show the letter to the board members in order for the board to repay Razzak's loans, and that Razzak needed to write the letter in order to be repaid. The letter stated, in part, that the loan was interest-free, and had been made to Ghafur for the purpose of research and development, and to cover operational costs until Gateway's opening. Ghafur told Razzak the gist of what to write in this part. Although Razzak received no response to the letter, she did start getting her loan payments. As of trial, Ghafur

still owed Razzak close to $55,000.

Edward Hudson, an investigative auditor for the Department of Justice and a certified fraud examiner, performed a reconstruction analysis of bank accounts maintained for Gateway and for Khadijah and Associates.  His analysis showed that the monies paid to Razzak came from public funds.  [FN4]

> FN4.  The trial court took judicial notice of the pertinent statutes and instructed the jury that, under the laws of California, charter schools are part of the state's public school system; charter school officials are officers of public schools to the same extent as members of other boards of education of public school districts; and a superintendent of a charter school system is, like other public school superintendents and board members, a public official.

### Counts 3 and 4-Payments to Italo Stanziale

On February 12, 2001, Italo Stanziale sold Ghafur a triplex, located on Dewitt Avenue in Clovis, for $149,000.  Ghafur took title in her name and said she was going to live there.  Ghafur gave Stanziale a $10,000 deposit, and Stanziale executed a deed of trust with the understanding that she would pay another $10,000 that September.  In addition, escrow instructions called for payments of $1,119 per month.  Beginning in June 2001, Stanziale received periodic checks that were signed by Ghafur and drawn on Gateway's bank account.  In approximately February 2002, Stanziale instituted foreclosure proceedings on the property because Ghafur had been late on several payments.

Stanziale never performed services or had a consultation agreement with Gateway, nor did he receive a check for $1,119 from Gateway for consultation services.  At no time did he spell his last name "Sotojicle."  When Abdul-Hafeez requested documentation of expenditures during the Hosaka and Nagel audit, however, Ghafur provided an invoice for consultation services in the amount of $1,114, dated July 7, 2001, from Italo Sotojicle to Gateway, which she said was a fee paid for the company's service in securing a guest house for teachers and staff at an in-service training program.

Hudson's financial analysis showed that the monies paid to Stanziale came from public funds.

### Counts 5 and 6-Payment to Heritage Development Corporation

On January 30, 2001, Ghafur purchased a $10,000 cashier's check, drawn on Gateway's account and made payable to HDC.  She purchased another $10,000 cashier's check, drawn on Gateway's account and payable to HDC, on April 6, 2001.

An account at Bank of America was established in the name of Heritage Homes to pay the mortgage on Baladullah.  On or about January 30, 2001, two cashier's checks in the amount of $10,000 each were drawn on Gateway's account and deposited into the Heritage Homes account.  On February 5, 2001, a transfer of $10,000 was made from the Heritage Homes account to Salih Ghafur, Ghafur's ex-husband.

Hudson's review of records showed the monies paid to Heritage Homes came from public funds.  The transfer to Salih Ghafur came from the public funds in the Heritage Homes account.

*Counts 7 and 8-Payment to Cosmopolitan Finance*

On September 22, 1999, Cosmopolitan Finance financed a car for Ghafur. The vehicle was repossessed in early June 2000. Cosmopolitan Finance initiated a small claims action for the balance still owed, and obtained a judgment in the amount of $2,500, plus court costs, on February 9, 2001. Cosmopolitan subsequently sought a writ of execution of wages. On June 15, 2001, it received a personal money order in the amount of $1,000, purchased by Ghafur and drawn on Gateway's account.

During the Hosaka and Nagel audit, Ghafur asked Abdul-Hafeez about a debt she owed to Cosmopolitan Finance. Abdul-Hafeez told Ghafur that she could take an advance from her paycheck. In the financial and payroll history Ghafur submitted for purposes of the audit, the $1,000 payment to Cosmopolitan Finance was shown as being taken as an advance against Ghafur's payroll.

Hudson's review of records showed that the payment made to Cosmopolitan Finance came from public funds.

*Counts 9 and 10-Payment to Fresno Business Services*

Fresno Business Services was a bookkeeping and payroll service in Fresno that was operated by Nguib "Nick" Abdallah. At Ghafur's request, Abdallah became Gateway's bookkeeper for payroll in approximately September 2001.

On November 5, 2001, Ghafur wrote a check to the Tulare County Tax Collector in the amount of $12,401.57. The check was drawn on the account of Khadijah and Associates. On November 6, 2001, at Ghafur's request that day for a loan, Abdallah wrote her a check from Fresno Business Service's line of credit in the amount of $12,500. The money was for the school, which was waiting for funds from the state. Ghafur said Abdallah would be paid within a month. That same day, Ghafur made a deposit in the amount of $13,485 into the account of Khadijah and Associates. On December 20, 2001, a cashier's check was drawn on Ghafur's account, payable to Fresno Business Service in the amount of $12,500. [FN5]

FN5. According to Abdallah, Ghafur gave him a check from Gateway, which he then exchanged for a cashier's check with which he repaid his line of credit.

Hudson's review of records showed that the payment to Fresno Business Service came from public funds.

*Count 11-The Short-Term Bond/Note*

Gateway's funding, like that of other charter schools, depended in large part on the ADA. Thus, charter schools were required to submit a report to FUSD for each 20-day attendance period. Judi Sommarstrom worked for Larry Powell, FUSD's associate superintendent, and received student enrollment and attendance reports from all of FUSD's charter schools. If Sommarstrom did not receive one in a timely manner from Gateway, which happened on occasion, she contacted Ghafur or Hamed. She did not know, however, who actually compiled the reports.

Habibah Amatussalam was Gateway's registrar. Hamed was her direct boss. As registrar, Amatussalam collected applications from parents who wanted their children to attend Gateway, and she made sure the necessary paperwork was in order. This information was kept in Gateway's files. In addition, each school site submitted

1  attendance sheets to her once a month.  From these, she prepared the student body
2  count and attendance reports, which she gave to Hamed and, if Ghafur asked, to Ghafur.

3      In spring of 2000, Karl Yoder was asked by people in the financial industry
   whether he could help structure financing for Gateway. [FN6]  Yoder first contacted
4  either Ghafur or Hamed by telephone, then met with them in Fresno, whereupon he
   became involved in business transactions with them.  During his dealings with
5  Gateway, it was Yoder's perception that Ghafur and Hamed were operating Gateway
   jointly, as a team.  This was his perception from general contact with both of them.
6

7        FN6.  At the time, Yoder, through his firm Delta Public Finance, was
          an independent financial advisor to municipal entities, including
          charter schools.  The use of municipal bonds and similar financing by
8         charter schools was then a relatively new field within the larger field of
          municipal bonds.
9

10     In April 2001, Yoder was involved in obtaining a loan for Gateway. This was
    done by means of a note for $945,000.  Wedbush Morgan Securities (Wedbush)
11  underwrote the bond for the funding.  At the time, Gateway reported an enrollment of
    between 500 and 700 students.  [FN7]

12        FN7.  All told, Yoder was involved in four fundings for Gateway. The
          first, on or about August 28, 2000, was in the amount of $256,000, and
13        was sold to broker-dealer ML Stern & Company. The April 2001
          funding was the second one.  The third, on or about September 27,
14        2001, was in the amount of $630,000, and was also sold to Wedbush.
          It is this funding that is the subject of count 11.  The fourth funding, on
15        or about December 19, 2001, was in the amount of $265,000.

16        . . . .

17     Near the time Gateway's headquarters moved from its facility on F Street to a
    site on Shields (which occurred sometime after July 4, 2001), Hamed requested
18  access to the student records and attendance records. Amatussalam saw this as a
    problem, because she generated the body count reports from the attendance records,
19  and was strict concerning what happened to the documents and who had access to
    them.  The documents detailed which students were prospective students and which
20  students were fully enrolled.  Amatussalam did not submit prospective students to
    FUSD for the purpose of generating ADA funds.  The actual student count was
21  submitted by her to Hamed, and it was his responsibility to send that information to
    FUSD.  It was also his responsibility to prepare the ADA reports.
22
       During this time, Amatussalam's working roster, which contained information
23  on all students who applied and not just those who were actually enrolled, was sent to
    FUSD.  When FUSD complained, Hamed and Ghafur asked Amatussalam whether
24  she had sent the list.  Ultimately, Hamed's wife admitted sending it.  Hamed told his
    wife not to send anything and not to touch anything she found on anyone's desk.  For
25  Amatussalam, this did not explain how Hamed's wife came to have the working
    roster, as it had not been printed or distributed, but instead was kept on
26  Amatussalam's computer.  In Hamed's presence, his wife said that Hamed told her to
    send the document to FUSD.
27
       Amatussalam reported this incident to Ghafur, who said she would look into
28  it.  At some point, Amatussalam paid to have locks put on the file cabinets, and she

then kept the student files locked.  She also paid for a computer person to come in and network the computers, so that everything that could be accessed without a problem was placed in a shared file, while passwords were assigned to sensitive information.  This caused problems, because Hamed wanted access to the files, and staff would not comply.  Both Hamed and the facilitator at one of the outside sites asked Amatussalam to unlock her files, but she refused, as documents had been changed, attendance sheets had been altered, and there were files with missing records.  Although Amatussalam had no information that Hamed had anything to do with that, it caused her concern when Ghafur announced to the staff of the registration office that Hamed was their immediate supervisor, had the power to hire or fire, and was to receive access to the records as he requested.  After the move to the Shields facility, there was no lock on the door to Amatussalam's office, and the file cabinets did not lock.  The student enrollment list on Amatussalam's computer remained passworded, however.

On several occasions in July and August 2001-particularly August-Ghafur and Hamed requested Yoder's assistance in obtaining additional funding for Gateway.

In September 2001, Yoder became involved in securing further funding for Gateway. During that time, he spoke with both Ghafur and Hamed about Gateway's student enrollment numbers.  When Yoder received a solicitation from Gateway, formally requesting to borrow an additional amount, he asked that a budget be provided.  On September 18, 2001, he received, by means of a facsimile that bore Hamed's name on the cover sheet, Gateway's projected fiscal year 2001-2002 budget.  The cover sheet stated that the budget was based on 1,450 students enrolled in the school's population.  Yoder then telephoned Hamed and indicated his desire to see a student list.  Yoder requested the enrollment list because this funding, unlike the earlier one, was based on actual enrollment as opposed to projections.  [FN8]  Accordingly, Yoder wanted to see names of students to verify they were actually enrolled, and he told this to Hamed.

FN8.  The April 2001 funding was to cover the expected cash flow shortfall in the coming year, based on Gateway's projections in April of what its student count would be in the fall.  Thus, neither Delta Public Finance (Yoder's company) nor Wedbush required actual enrollment numbers, aside from the actual enrollment as of April.  In conjunction with the April 2001 funding, Yoder received the projected student numbers from Hamed.

In a memorandum from Ghafur dated June 29, 2001, Yoder received a current student count, as well as projections of student counts for the fall.  According to Abdul-Hafeez, Ghafur asked her, in June, to make a growth projection, and Abdul-Hafeez prepared something regarding an increase of 300 students.  Ghafur subsequently told her that the report was incorrect, and gave it to Hamed.  According to Abdul-Hafeez, who conceded she was paraphrasing, Ghafur told Hamed to do whatever was needed to get the loan from Delta.  Ghafur and Hamed were the only two who dealt with Delta Finance.

After Yoder spoke to Hamed, he received, by way of a facsimile bearing Hamed's name and what purported to be his signature, an enrollment list showing a count of 1,352 students.  [FN9]  According to Amatussalam, who could not say whether the signature actually belonged to Hamed, the list was not accurate.  For instance, it included students from the Patricia Young, Oscar Romero, Ezra, and Faaidah Learning Centers, none of which were part of Gateway in September 2001.  In addition, some of the pages had cut-and-paste lines or areas where it appeared

something had been whited out.  Part of the document came from Amatussalam's working documents, which she kept on her computer.  Thus, some of the student names on the student enrollment list sent to Yoder were the same as those on the student waiting list Amatussalam had created in June 2001, at Ghafur's request, and had sent to Ghafur.  In September 2001, Gateway did not have 1,352 students, although actual enrollment was roughly 900.  After September 11, the correct figure might have been 701, as two schools were kicked out of their sites.  [FN10]

     FN9.  In the enrollment list Yoder received in conjunction with the September 2001 funding, there were 1,227 student names, but a confirmed student count of 1,352.  Yoder's understanding of the difference was the count at the Ezra Learning Center.  As the document stated that the student count was confirmed, Yoder's understanding was that those students were enrolled, but the names were incomplete.

     FN10.  According to enrollment reports submitted by Gateway to FUSD, when Gateway opened in September 2000, it had a total of 167 regular students and 31 independent study students at its various school sites.  In May 2001, at the end of the first school year, Gateway had a total of 597 regular students and 83 independent study students at its sites.  These were the enrollment numbers; attendance, which was reported to FUSD for generating ADA, was derived from the number of students who actually attended the various schools and was usually lower, given that some enrolled students did not attend on a given day due to illness or other reasons.  According to Gateway's enrollment reports for the 2001-2002 school year, Gateway had a total of 701 students for the school year's first attendance period, which ended September 14, 2001.  For that report, Gateway did not submit a number for the Patricia Young and Oscar Romero sites, which were no longer affiliated with Gateway, nor did it report the Ezra Learning Center or Faaidah school as being part of Gateway.

     When Yoder received the enrollment list, he noticed there was a shortfall between the number of names and the 1,450 figure contained in the projected budget.  The main purpose of the document was to verify the actual enrollment count.  Yoder stated this to Hamed and advised him that the enrollment count was crucial for this funding, because enrollment was what determined the money flowing to the school, and the notes could not be repaid without the enrollment that was being shown.  When Yoder asked why the 1,352 number did not match the 1,450 figure, Hamed said that 1,450 was the actual student count, but they only had 1,352 names.  In addition, Yoder had several conversations, probably on a daily basis, with both Hamed and Ghafur, concerning the need for the funding, the timing of the funding, and the population count.  Yoder confirmed that 1,352 was a "hard" number as opposed to a projection.

     At no time did Hamed say Gateway actually had 701 students enrolled in September 2001, although, in April 2001, Gateway was projecting an enrollment of 700 for the 2001-2002 fiscal year. . . .  [I]f Yoder had known Gateway's enrollment in September 2001 was approximately 700, and with the April bond issue already outstanding, he would not have recommended the $630,000 funding to Wedbush.  Similarly, if Gateway had received the April funding based on a projected enrollment of 700, then solicited a second loan with a showing that enrollment was still at 700, Yoder would not have recommended the second loan . . . .

In September 2001, Yoder's relationship to Gateway was that of a financial advisor. As such, his duties entailed assisting Gateway in preparing documentation in a financing package and showing that package to broker dealers and investment banks as potential investors. The relationship did not entail acting on Gateway's behalf, but instead acting as intermediary between Gateway and broker/underwriter firms. He contracted with Wedbush in conjunction with the September 2001 funding, and worked primarily with Richard Grossman, a public finance investment banker at Wedbush, in that regard. Yoder passed the student enrollment list on to Wedbush, so Wedbush could use it in its review and decision whether to loan the money.

. . . .

Prior to the September 2001 funding, Grossman spoke with Ghafur and Hamed in order to review the documentation. He contacted Hamed because Hamed was the person in charge of finance for Gateway. When Grossman asked Hamed what the student enrollment and ADA were at that time, since, at the time of the April 2001 funding, Gateway had had 700 students and was expanding, Hamed stated the student enrollment number was 1,350. Grossman asked for documentation, which was sent to Yoder. Yoder provided Grossman with the student enrollment list, dated September 18, 2001, and purportedly from Hamed, that showed an enrollment number of 1,352 students. It was explained to Grossman-he believed by Yoder and Hamed-that the list comprised students who were actually enrolled in Gateway, not a prospective population. In turn, Grossman presented this document to Wedbush's underwriters.

In making the decision to fund and finance, Grossman placed equal significance on the September 2001 actual enrollment figure and on the expected increasing student population. If 701 students would have generated approximately $3.5 million in ADA funds, that would have been enough to cover Gateway's notes and operation of its school facilities. Based on his calculations, Grossman normally still would have recommended that Wedbush issue the bonds. Grossman believed, however, that reference to 701 students described a hypothetical situation, as, to his knowledge, there were never 701 students enrolled at Gateway in September 2001. Had the true enrollment been 701 students, Grossman would not have recommended the issue to Wedbush, because he was told there were 1,350 students.

The student enrollment list was also received by Robert "Cap" Harlan of Wedbush. The list was provided by Gateway's financial advisor, Delta Financial. In this respect, Karl Yoder was the individual from Delta Financial with whom Wedbush dealt with respect to the September 2001 funding. Wedbush relied on the information provided to it. The list contained 1,227 individual student names and showed a total student count of 1,352. The student enrollment was "by far and away" the most important factor Wedbush used in underwriting, since the source of money that schools can receive-hence, the source of money to service the bond issue debt-is based very strongly on the number of students enrolled, due to ADA funding.

Wedbush created a term sheet for the funding, which gave the basic terms of the transaction, the borrower, the interest rate, the amount borrowed, the maturity date, and the basic materials of issue. The term sheet, which was disseminated to Wedbush's brokers and correspondent brokers, contained a brief description of Gateway that was created by Wedbush and stated that Gateway's enrollment was approximately 1,350. Wedbush obtained this enrollment figure from Gateway's student list, but did not independently try to verify it. [FN11] If Wedbush had known that Gateway was actually reporting some 700 students, Harlan "seriously doubt[ed]" it would have underwritten the September 2001 offering, as that number of students

would not have been enough to service both debt issues and allow the school to pay its operating costs.  In short, Wedbush relied "very heavily" on the 1,352 student number in underwriting the loan.  [FN12]  Wedbush only cared about confirmed students, not projected increase.

> FN11.  Wedbush did not receive anything directly from Gateway, but instead received all communications through Yoder.

> FN12.  According to Harlan, Wedbush took the list of 1,272 actual names as being a very accurate list of Gateway students. He did not see a major difference between that number and the 1,352 total. The most important list was the list with the actual students' names. That list of 1,272 students was enough to support the underwriting.

In September 2001, Sharon Liska was senior vice-president of investments with Wedbush at its branch office in Anchorage, Alaska.  As a broker, she advised clients on their portfolios, what to buy, and where to place their money.  In this capacity, she regularly had contact with Cap Harlan, manager of Wedbush's bond department in Los Angeles, with respect to the sale of bonds.

In September 2001, Liska, who had 30 to 40 clients who were interested in short-term investments, was contacted by someone from Wedbush's Los Angeles office about Gateway bonds.  She in turn contacted Harlan to question him about the bonds, which were for a term of 13 months and paid an unusually high rate of nine percent taxable interest. . . . With respect to Gateway's enrollment, Harlan told Liska that there were 1,500 currently-enrolled students, with expansion to 3,000 to 3,500 within the next few months.  [FN13]  When she asked him for the exact current enrollment figure, he told her either 1,351 or 1,352.  The student enrollment numbers were one of the initial factors on which she relied.

> FN13.  Harlan denied ever telling Liska that Gateway had 1,500 students enrolled.  Yoder did not recall telling anyone that Gateway had 1,500 students, but admitted he possibly may have done so as an approximation.  Yoder had no direct dealings with either the brokers or the investors.

As a result of the information she received from Harlan, Liska contacted those among her clients who were looking for investment-grade, short-term bonds.  Eight of these clients-including her father and uncle-were involved in the Gateway funding.  These people invested a total of $270,000.  [FN14]  Liska spoke to each of them individually and told them she had a double A-rated, short-term bond issue . . . . None of Liska's investors requested enrollment figures from her.  The investors would have relied on her telling them that there was an increasing demand, which statement would have been made based on the figures Harlan gave her.

> FN14.  Liska testified that she had seven clients who invested a total of $260,000. When she was asked to give each individual name and amount, however, there were eight clients who invested a total of $270,000.

Although Ghafur's name was brought up as the person from whom Wedbush got its information, Liska never spoke to anyone with Gateway, nor did anyone from Gateway make any representations directly to her with respect to the bond.  She presented her investors with the facts that had been given to her, and they decided whether to invest.  She did not undertake independent verification of what Harlan told

her . . . . Had she known these were not bridge bonds, were nonrated, and that there was not more backing to them, she would not have bought them. Ultimately, this bond was not satisfied and so the bondholders were never repaid.

In September 2001, Wedbush contacted broker Paul Dixon with an offer involving the Gateway bond, and Dixon worked through Wedbush, with whom he had a longstanding relationship through the securities firm for which he was an independent contractor, on the issue.

Dixon relied on information contained in the term sheet [he received from Wedbush], specifically the student enrollment number for Gateway, which was given as approximately 1,350 . . . .

Based on the term sheet, Dixon contacted several of his clients. He told them that the investment was a school bond issued by a charter school; that the school had a certain number of students and that the state was required to pay a certain amount; and that, based upon the revenues coming in versus the expenditures they showed, it looked like a very solid bond issue. Two agreed it would be a good investment; Karyl Atherton paid $5,000, and Gene and Frances Senger paid $25,000. They relied on the information Dixon gave them, which he received from Wedbush . . . . In terms of the enrollment number, the investors relied on the fact the term sheet said there were approximately 1,350 students in the sense that, had the number been significantly less, Dixon probably would not have offered them the bond, since in his mind, it would have been a degradation of the security from the first bond issue to the second. . . . If Dixon had been told Gateway had approximately 700 students enrolled at the time of the second offering, it would have meant to him that enrollment was flat or slightly declining and yet the school was coming back for more money. Under such circumstances, he would have decided not to sell the bond.

As the underwriter with respect to the September 2001 funding, Wedbush purchased the bond/note from the issuer (Gateway) and resold it to investors. All told, 17 investors purchased the September 2001 bond, through seven different brokers. Gateway was paid the $630,000, less Wedbush's commission and Yoder's fee, within a few days after the underwriting closed. None of the bondholders received any of their principle on this funding.

*Count 12-2000 Income Tax*

Hudson's review of records showed that amounts paid to and for the benefit of Ghafur from Gateway's account in 2000 totaled $80,141 .99, of which $70,141.99 was shown as constituting salary. In addition, expenses in the amount of $7,915.13 were paid. The Franchise Tax Board was unable to locate any tax documents filed by Ghafur for tax year 2000. In the opinion of Phillip Frailey, a special agent for the Franchise Tax Board, Ghafur accrued taxable income for that year and should have filed a return.

*Count 13-2001 Income Tax*

Hudson's review of records showed that amounts paid to and for the benefit of Ghafur from Gateway's account in 2001 totaled $272,648.16, of which $154,021.56 was shown as constituting salary. In addition, expenses in the amount of $13,500 were paid. Although Ghafur filed a state income tax return for 2001, it was Frailey's opinion that she underreported her taxable income for that year.

///

**DEFENSE EVIDENCE**

In April 2001, Yoder received a document from either Hamed or Ghafur, stating that Gateway anticipated an increase in enrollment from 550 to 700 students in fiscal year 2001.  On or about June 22, 2001, Yoder received a facsimile transmission from Hamed that, unlike the subsequent cover sheet for the list showing a student enrollment of 1,352, did not bear a signature and had a header that included Hamed's name and telephone number. [FN15]  On or about June 29, 2001, Yoder received a student list from Ghafur that showed a student count of 1,112, including the waiting list for the main campus at Fruit and Dakota.  In light of the September 2001 enrollment list, Yoder believed Gateway had had about 550 students at the end of the fiscal year and, as of April, an enrollment of 700 was being projected for fall.  That enrollment projection kept rising, however, so that over the summer, it grew to 1,000, and, by September, Gateway actually had slightly more than 1,300 students enrolled.  Gateway never reported to Yoder a student enrollment of 701 in September 2001.

FN15.  Yoder was unable to recall whether other facsimiles he received from Hamed also had a header.  He denied creating or altering the facsimile cover sheet for the September 2001 enrollment list, creating any student numbers, or making up any documentation to support the September 2001 funding.  He denied signing Hamed's name to the cover sheet.

Yoder did not recall Hamed ever telling him that the student enrollment in September 2001 was exactly 1,352 students, but he did recall Hamed saying in several conversations that the enrollment count was in the range of 1,300 to 1,500.  Yoder was certain that what was conveyed to him was a current, actual student count and not a projection or expectation.  When the September list said "student count confirmed" without listing names, Yoder took it to mean that it was not a projection, but instead the numbers were actual students whose names were not available for that list.

In October, Hamed and Ghafur mentioned that September 11 had impacted enrollment.  For the December 2001 funding, Yoder did not have an updated student enrollment list and was working off of the list from the September funding.  At an in-person meeting at Gateway in December, Yoder talked to both Ghafur and Hamed about the September 2001 student enrollment list.  In December 2001, Hamed told Yoder there were 1,352 students.  Yoder did not recall an exact conversation with Ghafur, but it was clearly indicated by both Ghafur and Hamed that the student enrollment list essentially was unchanged.  They mentioned that a Sunnyvale school had closed, but that enrollment definitely was well above 1,000.  They did not tell Yoder they had around 700 students; if they had, he would not have been involved in funding in December 2001.  Similarly, if they had said they had 701 students in September 2001, he would not have been involved in that funding, either.

As far as Yoder could tell, Ghafur and Hamed co-ran Gateway.  Hamed "did more of the nuts and bolts stuff" while Ghafur did "more of the overall directions," but they seemed to him to be equally responsible for the school's operation.  Yoder conceded his perception could have been mistaken.

In 2001, Lewis Wiley was director of accounting and payroll for FUSD.  As such, his responsibilities included assisting the charter schools with their unaudited actuals.  In terms of Gateway, Wiley was in contact mostly with Hamed at first, and then with Islah Abdul-Hafeez.  On October 1, 2001, Wiley inquired of Abdul-Hafeez about some of the numbers in the unaudited actuals Gateway had submitted for the fiscal year ending June 30, 2001.  Wiley wanted to know why the unaudited actuals

were so different from the budget Gateway had submitted.  Abdul-Hafeez explained that enrollment had jumped significantly compared to what had been expected, due to the opening of additional sites and new promotions that had attracted more students. She stated that Gateway had had a student enrollment of 300 in September 2000, a student enrollment of 750 in June 2001, and a student enrollment of 1,450 in September 2001.  Wiley did not recall anyone from Gateway other than Abdul-Hafeez stating that Gateway had 1,450 students enrolled in September 2001.  The 1,450 number raised concerns for Wiley because it was a large amount of growth. However, it was not necessarily unusual for charter schools to have budget projections that were incorrect or discrepancies between their budgets and unaudited actuals, or to have incorrect projected student enrollment figures.

Rommie Horn began working for Gateway just prior to summer 2001.  Horn was athletic director and did some substitute teaching.  Hamed introduced Horn to Gateway, but it was Ghafur who hired him.  Hamed was his immediate supervisor.  It was Horn's belief that Ghafur was Hamed's boss.  Hamed would say that Ghafur was putting pressure on Hamed to make sure Horn was doing what he was supposed to be doing.  Also, whenever Horn had a question regarding subjects such as pay, transferring to a different campus, or going into the classroom instead of being athletic director, Hamed would say he (Hamed) had to check with Ghafur to make sure it was all right.

Horn went to Yoder's office in Sacramento two or three times. Once, in December 2001, was to deliver Christmas presents.  The other time was before the beginning of school, in late August or early September.  Ghafur asked him to deliver a large manila envelope, about an inch thick, to Yoder.  Although she did not say what the envelope contained, she said it was important and needed to get there immediately.

Hamed presented evidence of his good character for truth, honesty, and integrity.  He testified on his own behalf that he first met Ghafur in late 1999, when he was already working as a regional manager for One to One Learning Foundation, a charter school.  He assisted in putting together a management team and a team of professionals, including Al Uribe, that facilitated the ultimate launching of Gateway, which, at the time, had been chartered, but which had only an administrative staff.

In 2000, Gateway obtained a $250,000 grant from the state.  This was the first money the school received, and it was enough to begin organizing.  Hamed, who had years of experience in nonprofit business services, recommended to Ghafur and the personnel staff to engage an accountant to ensure full oversight and control of the reporting of finances received from governmental agencies.  An accountant was hired, but strictly for payroll.  In approximately July 2000, Gateway obtained its first students.

Hamed formally became Gateway's chief administrative officer sometime in 2000.  His wife worked as his secretary in a volunteer capacity.  Although Hamed had a strong recommendation relationship with Gateway's board, he did not have the power to hire and fire.

Hamed's duties involved administrative oversight of Gateway's sites and departments, and assisting in the day-to-day operations of the organization.  With respect to the collection of attendance and student enrollment reports, Hamed had an oversight function in relation to the registrar.  Everything was organized to flow through the department of the registrar, and ultimately to Hamed in summary form or whatever specified form he needed to prepare reports for external organizations,

1    primarily FUSD.

2          Student information was conveyed to outside sources for purposes of ADA
     funding.  For a student to qualify for ADA funding, documents such as birth
3    certificate, immunization record, and acceptable form of identification had to be on
     file.  Based on where X's were placed on the monthly forms Hamed received from the
4    registrar's office, Hamed could tell how many students qualified for ADA funding.
     Only students who met all requirements and qualified for ADA funding were reported
5    to FUSD.  A student could have been enrolled in Gateway and attending school, but
     would not have been claimed for ADA funding if the necessary documents were not
6    on file.

7          The dispute between Hamed and Amatussalam arose because Amatussalam
     could not provide all of the necessary information on some of the students she was
8    reporting as being enrolled.  Hamed refused to report the students who were not
     verified.  This type of problem occurred often.  The school sites sent monthly
9    attendance reports to Amatussalam, but were also required to send a duplicate copy to
     Hamed to calculate the ADA they earned.  In some instances, the reports
10   Amatussalam gave Hamed at the end of the month did not reconcile with the figures
     that had been reported to him through the copies sent by the sites.  Hamed had to
11   reduce a number of figures Amatussalam reported, causing philosophical problems
     between them.  When Amatussalam complained to Ghafur, Ghafur instructed her to
12   give Hamed access to the records, but Amatussalam never did.  She also changed the
     locks and put a password on her computer.  Hamed was Amatussalam's supervisor
13   only in theory; in reality, all department heads reported directly to the superintendent
     (i.e., Ghafur) and the board.  Because Amatussalam would not give him access to the
14   records, Hamed could only fulfill his reporting duties through the secondary
     mechanism of the summary reports she provided to him.  She provided a monthly
15   body count, which gave him the number and grade level of enrolled students who had
     accrued ADA funding for the month.  The body count was solely numerical and had
16   no names attached.  Although Hamed felt Amatussalam was insubordinate on a
     number of occasions, he did not recall an incident in which she confronted him about
17   sending a working copy of her enrollment list to FUSD.  No one in his office,
     including his wife, had access to Amatussalam's files, and Hamed did not recall any
18   incident in which his wife said he had told her to send the information to FUSD.

19         On September 19, 2001, Hamed delivered a memorandum to Amatussalam in
     which he asked for a complete list of students enrolled for the 2001-2002 fiscal year.
20   He made the request because he had heard Abdul-Hafeez tell someone Gateway had
     1,450 students and that documents reporting that enrollment were being prepared.
21   Amatussalam complained to Ghafur the day after Hamed made the request.  In
     November, Amatussalam presented Hamed with an enrollment list showing
22   approximately 980 students.

23         The student list with the attached facsimile cover that purportedly was signed
     by Hamed, gave "student count confirmed" in response to a process undertaken by the
24   registrar's office to have the director of the particular learning center verify whether
     the parents intended to enroll their children at Gateway.  These were not students who
25   were actually enrolled. Similarly, students shown as being on a waiting list were not
     considered enrolled.  Hamed denied compiling the list or extracting it from
26   Amatussalam's computer, or seeing it prior to preparation for trial. He denied signing
     the facsimile cover sheet, that the document bore his actual signature, and
27   transmitting the document to Yoder.

28         Hamed may have sent facsimiles to Yoder in September 2001, although he did

not recall sending any directly.  When Abdul-Hafeez became compliance officer, there was a protocol that mandated that all information sent outside the organization by anyone first had to be reviewed by her and passed on to the superintended before it went out.  Thus, if Hamed sent a facsimile, it was with authorization from his supervisor.  Facsimiles from Hamed bore a header, which the one to Yoder did not have.

Hamed denied ever telling Grossman that Gateway had 1,352 students enrolled in September 2001.  Gateway's enrollment at that time was 701 students.  Hamed presented that information to Yoder in September 2001, in the form of a budget based on an actual enrollment of 550 in June 2001, with a projected enrollment of 700 at the beginning of the new academic year.  In turn, Hamed received, on Yoder's letterhead, a document showing a bridge loan program for Gateway based on the scenario of an enrollment of 700 for the 2001-2002 fiscal year.  Gateway's board asked Hamed also to generate budget scenarios based on enrollment of 1,000 and 1,450 students.  These were never representations of actual enrollment.  Hamed admitted giving Yoder a student enrollment number of 1,450, but only as a budget projection.  Hamed denied that Yoder ever said he needed to confirm the student number or asked for a confirmed student number or list of names.  Hamed denied giving Yoder an enrollment list of 1,352 students, which included learning centers he knew were no longer part of Gateway.

Hamed understood Delta Financial to have loaned money to Gateway.  His perception of Delta was that it either represented a financial institution or an institution that had funds available for bridge loans to charter schools.  When he signed the intercept letter, which he believed included the $630,000 loan, he was signing to protect Delta and anyone associated with the lending process.  He had no idea of the source of the funds or that private investors would be purchasing bonds from Wedbush.  Yoder never explained this; there was no discussion between him and Hamed beyond the fact that Yoder would facilitate acquisition of the funds necessary for the bridge loan.

In January 2001, Ghafur and other members of the executive board wrongly accused Hamed of trying to start his own charter school with someone.  Until that time, Hamed had maintained the check register for Gateway.  He was told he was not to be involved in Gateway's financial affairs, and Ghafur told him he was on probation for 90 days.  As he was never told he had been removed from probation, he believed he was still on probation in September 2001.  As being placed on probation made him feel despondent and ostracized, he would never have been involved with Ghafur in a scheme to steal money from bondholders.  In addition, although he was unsure whether he and Ghafur belonged to the same Muslim sect, they did not have the same Tabliq, meaning the direction in which they focused their attention as far as leadership was concerned.  Thus, there were basic ideological differences between them, such that Hamed "[a]bsolutely" would not have been involved in a common plan or scheme with her.

Hamed, who was not a member of Gateway's board, attended board meetings when invited by the board to give special reports, including budget.  Those sometimes included student enrollment figures as related to budget.  Minutes for the October 2, 2001, board meeting, at which Ghafur was present, indicated Gateway had 1,400 students, although the source of that figure was not stated.  As chief administrative officer, Hamed had access to enrollment information through the registrar's office.  However, the minutes did not show Amatusalam or Abdul-Hafeez as attending that meeting.  The only attendees who would have been in a position to give that information were Hamed and Ghafur.  The number did not come from Hamed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Until the beginning of this case, Hamed was chairperson of the nine-member board of a mosque in Fresno. He had held this elected position for two years. In his capacity, he had access to hundreds of thousands of dollars that belonged to the mosque. He neither took, nor was ever questioned about taking, money that did not belong to him. In addition, he previously was treasurer of a mosque in San Francisco for over seven years, and never took, nor was questioned about taking, any of that money. Hamed denied ever trying to defraud anyone in this case; in fact, he tried to protect the lenders by signing the intercept letter.

See Resp't Lodged 1 (some footnotes omitted).

### Discussion

## I.   Jurisdiction and Venue

A person in custody pursuant to the judgment of a state court may file a petition for a writ of habeas corpus in the United States district courts if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, n.7 (2000). Venue for a habeas corpus petition challenging a conviction is proper in the judicial district in which the petitioner was convicted. 28 U.S.C. § 2241(d).

As Petitioner asserts that she is in custody pursuant to a State conviction which violated her rights under the United States Constitution, the Court has jurisdiction over this action. 28 U.S.C. § 2254(a). Petitioner was convicted in Fresno County, California, which is within the Eastern District of California, and thus venue is proper in the Eastern District. 28 U.S.C. § 84; 28 U.S.C. § 2241(d).

## II.   Standard of Review

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of AEDPA and is consequently governed by its provisions. See Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Thus, the petition "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)), overruled in part on other grounds, Hayward v. Marshall, 603 F.3d 546, 555 (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

1      Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

2  Petitioner's habeas petition as Petitioner is in the custody of the California Department of

3  Corrections and Rehabilitation pursuant to a state court judgment.  See Sass v. California Board of

4  Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006) overruled in part on other grounds, Hayward,

5  603 F.3d at 555.  As a threshold matter, this Court must "first decide what constitutes 'clearly

6  established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538

7  U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal

8  law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's]

9  decisions as of the time of the relevant state-court decision."  Id. (quoting Williams, 529 U.S. at

10  412).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal

11  principle or principles set forth by the Supreme Court at the time the state court renders its decision."

12  Id.  Finally, this Court must consider whether the state court's decision was "contrary to, or involved

13  an unreasonable application of, clearly established Federal law."  Id. at 72 (quoting 28 U.S.C. §

14  2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

15  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or

16  if the state court decides a case differently than [the] Court has on a set of materially

17  indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the

18  'unreasonable application clause,' a federal habeas court may grant the writ if the state court

19  identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

20  that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "[A] federal court may

21  not issue the writ simply because the court concludes in its independent judgment that the relevant

22  state court decision applied clearly established federal law erroneously or incorrectly. Rather, that

23  application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable

24  application" inquiry should ask whether the State court's application of clearly established federal

25  law was "objectively unreasonable."  Id. at 409.

26      Petitioner bears the burden of establishing that the state court's decision is contrary to or

27  involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle,

28  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

1   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

2   decision is objectively unreasonable.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While

3   *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents

4   need be reasonably applied, we may look for guidance to circuit precedents"); Duhaime v.

5   Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999) ("[B]ecause of the 1996 AEDPA amendments, it

6   can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit

7   precedent on a federal Constitutional issue . . . .  This does not mean that Ninth Circuit case law is

8   never relevant to a habeas case after AEDPA.  Our cases may be persuasive authority for purposes of

9   determining whether a particular state court decision is an 'unreasonable application' of Supreme

10  Court law, and also may help us determine what law is 'clearly established'").  Furthermore, the

11  AEDPA requires that the Court give considerable deference to state court decisions.  The state

12  court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  A federal habeas court is

13  bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.

14  2002).

15          The initial step in applying AEDPA's standards is to "identify the state court decision that is

16  appropriate for our review."  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more

17  than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last

18  reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) for the presumption

19  that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same

20  ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained

21  state court decisions to the last reasoned decision to determine whether that decision was contrary to

22  or an unreasonable application of clearly established federal law.  Bailey v. Rae, 339 F.3d 1107,

23  1112-13 (9th Cir. 2003).  Petitioner raised each of her three claims brought in the instant petition

24  through a direct appeal to the California Court of Appeal, which affirmed the judgment in a reasoned

25  opinon.  See Resp't Lodged 1.  Petitioner's claims were then raised in a petition for review to the

26  California Supreme Court, which summarily denied review.  See Resp't Lodged 2.  The California

27  Supreme Court, by its "silent order" denying review, is presumed to have denied the claims

28  presented for the same reasons stated in the opinion of the lower court.  Ylst v. Nunnemaker, 501

1  U.S. 797, 803 (1991).  As the California Court of Appeal was the last state court to issue a reasoned

2  opinion;  the Court analyzes whether the appellate court's decision is an objectively unreasonable

3  application of federal law.

4  **III.    Review of Petitioner's Claims**

5          The petition for writ of habeas corpus sets three grounds for relief, contending that her rights

6  were violated by the superior court.  Petitioner asserts that: (1) there was insufficient evidence in

7  support of her conviction; (2) the trial court's failure to provide a proper jury instruction amounted to

8  a violation of her rights to due process; and (3) the trial court erred in failing to find a prima facie

9  showing of discrimination by the Prosecution's improper strike of a juror.

10         **A.    Ground One:  Sufficiency of the Evidence**

11         Petitioner contends her due process rights were violated as there was insufficient evidence to

12 show she directed, authorized, or participated in the false representation of student enrollment with

13 respect to the September 2001 funding.  More specifically, she argues that the evidence was

14 insufficient to sustain either her conviction for grand theft on count 11 or the jury's finding as true,

15 special allegations one (Penal Code § 186.11, subd. (a)(2)) and four (Penal Code § 12022.6, subd.

16 (a)(2)).  The California Court of Appeal rejected Petitioner's claim, finding that there was sufficient

17 evidence to support the conviciton.  See Resp't Lodged 1.

18         "[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal

19 case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to

20 constitute the crime with which he is charged.'"  Jackson v. Virginia, 443 U.S. 307, 314, (1979)

21 (quoting In re Winship, 397 U.S. 358, 364, (1970)).  "A petitioner for a federal writ of habeas corpus

22 faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state

23 conviction on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)

24 (noting that under AEDPA, a petition for habeas corpus may only be granted where the state court's

25 application of Jackson was objectively unreasonable).  Thus, a state prisoner is only entitled to

26 habeas relief on this ground where no rational trier of fact could have found proof beyond a

27 reasonable doubt based on the evidence adduced at trial.  Jackson, 443 U.S. at 324; see McDaniel v.

28 Brown, --- U.S. ----, ----, 130 S.Ct. 665, 666, --- L.Ed.2d ----, ---- (2010) (per curiam).

1    Pursuant to the Supreme Court's holding in <u>Jackson</u>, the test to determine whether a factual

2    finding is fairly supported by the record is "whether, after reviewing the evidence in the light most

3    favorable to the prosecution, any rational trier of fact could have found the essential elements of the

4    crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319; see <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781

5    (1990); <u>Bruce v. Terhune</u>, 376 F.3d 950, 956-957 (9th Cir. 2004) (quoting <u>Jackson</u>, 443 U.S. at 319)

6    (stating "<u>Jackson</u> cautions reviewing courts to consider the evidence 'in the light most favorable to

7    the prosecution'").  Where the record supports conflicting inferences, a federal habeas court "must

8    presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such

9    conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326.

10   Additionally, a jury's credibility determination is "entitled to near-total deference under <u>Jackson</u>,"

11   (<u>Bruce</u>, 376 F.3d at 957), as assessing the credibility of witnesses is generally beyond the scope of a

12   <u>Jackson</u> review.  <u>Schlup v. Delo</u>, 513 U.S. 289, 330 (1995).  Lastly, a federal habeas court must

13   presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); <u>Kuhlmann v.</u>

14   <u>Wilson</u>, 477 U.S. 436, 459, (1986).  This presumption of correctness applies to a state appellate

15   court's determinations of fact as well as those of a state trial court.  <u>Tinsley v. Borg</u>, 895 F.2d 520,

16   525 (9th Cir.1990).

17       Sufficiency of evidence claims are judged by "the substantive elements of the criminal

18   offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324, n. 16.  Petitioner was convicted of theft

19   by false pretenses pursuant to California Penal Code section 487.  As the California Court of Appeal

20   stated in affirming Petitioner's conviction, theft sounding in false pretenses requires three

21   elements-namely: "(1) The making of a false representation; (2) knowledge that the owner was

22   actually defrauded and that he parted with his property; and (3) proof that the owner was actually

23   defrauded and that he parted with his property in reliance on false representations. [Citations.]"  See

24   Resp't Lodged 1 at 23.  As noted by the Court of Appeal,

25       A defendant is guilty of theft by false pretenses if he or she made a false
         representation *or intentionally caused one to be made*. . . .  'A principal, in order to be
26       held criminally liable, must be shown to have knowingly and intentionally aided,
         *advised or encouraged* the criminal act committed by the agent.'
27
     See Resp't Lodged 1 at 23 (citations omitted) (emphasis added).
28

The Court of Appeal observed that while there was no direct evidence presented that Ghafur was involved in Hamed's falsely representing enrollment figures, "there was ample circumstantial evidence, however, from which a rational trier of fact could have concluded she was knowingly and purposely involved, and hence was criminally liable." See Resp't Lodged 1 at 24. The Court of Appeals stated:

> According to Islah Abdul-Hafeez, in June 2001, Ghafur had her prepare budget projections based on projected student increase. Abdul-Hafeez subsequently received a telephone call from Ghafur, telling her that Abdul-Hafeez's report was incorrect. Abdul-Hafeez's understanding was that her report was "axed," and Ghafur gave the assignment to Hamed. Ghafur told Hamed to do whatever was needed to get the loan from Delta . . . .
>
> In late June 2001, after the April 2001 funding, Ghafur sent Karl Yoder what her cover memorandum termed the current student count for the 2001-2002 school year, with a waiting list for the main campus and student counts for new sites. The attached lists, which were shown as being confirmed student projections, gave a count of 1,112 students. During July and August-mostly in August-both Ghafur and Hamed made several requests to Yoder about obtaining funding, following which Yoder had conversations with Hamed about the number of students Gateway had. Hamed then provided a budget based on 1,450 students, and, when Yoder asked for the names of actual students and not a projection, a list showing an enrollment count and verification of 1,352 students. During this time, Yoder had several conversations-probably on a daily basis-with both Hamed and Ghafur, concerning the need for the funding, the timing of the funding, and about the population count. Although he did not recall a specific conversation with Ghafur about needing the actual student numbers as opposed to a projection, it was an extremely important point because the enrollment count would be critical in repayment of the notes. It was Yoder's impression that Ghafur and Hamed were operating Gateway as a joint management team . . . .
>
> . . . .
>
> Gateway's board minutes for October 2, 2001, showed a reference to Gateway having 1,400 students. Ghafur attended that meeting. Of those who attended that meeting, only Ghafur and Hamed would have been in a position to give that information.
>
> According to Rommie Horn, who worked for Gateway in September 2001, Ghafur was Hamed's boss. Whenever Horn had a question about something, Hamed would have to check with Ghafur . . . .
>
> Hamed denied sending Yoder the student list showing an enrollment of 1,352 students. When he sent a facsimile, however, it would have been with the authorization of his superior. He was subject to a protocol mandating that all information going outside the organization had to first be reviewed by Abdul-Hafeez and then go on to the superintendent before it went out. Ghafur was Gateway's superintendent and Hamed's superior. Hamed followed this policy "[t]o the letter of law."
>
> From the foregoing evidence, a rational trier of fact could have inferred that

1    Hamed inflated the student enrollment figures, for purposes of securing the
     September 2001 funding, with Ghafur's knowledge and at her behest. This is
2    especially true since jurors reasonably could have concluded Hamed had no personal
     motive for misrepresenting Gateway's student enrollment in order to obtain funding,
3    aside from the motive all Gateway employees presumably had-to keep the school
     going so that they could continue to receive their salaries.  Ghafur, by contrast, had
4    the motive of obtaining more funding so that she could continue to use the school's
     money as her own personal slush fund, something she had been doing well in advance
5    of the September 2001 funding.

6        See Resp't Lodged 1 at 24-25.

7        Initially the Court notes that it must accept the appellate court's findings regarding the

8    requirements necessary to support a conviction under California Penal Code section 120221(a)(1).

9    See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) (stating that "a state court's

10   interpretation of state law, including one announced on direct appeal of the challenged conviction,

11   binds a federal court sitting in habeas corpus"); see also Musladin v. Lamarque, 555 F.3d 830, 838 n.

12   6 (9th Cir.2009) (finding that habeas court must presume that state courts know and follow the law

13   and that state-court decisions be given the benefit of the doubt under AEDPA deferential standards).

14   Additionally, the Court notes that in reviewing sufficiency of evidence claims, California courts

15   expressly follow the standard articulated by the United States Supreme Court in Jackson. See People

16   v. Smith, 37 Cal.4th 733, 738-739 (2005); see also People v. Catlin, 26 Cal.4th 81, 139 (2001).

17   Thus, the relevant question before a federal habeas court "remains whether the state court in

18   substance made an objectively unreasonable application of the Jackson standards for sufficiency of

19   the evidence." Id.

20       The Court finds that the state court's decision was not an objectively unreasonable application

21   of the Jackson standard.  As the appellate court noted, there was ample circumstantial evidence to

22   find that Ghafur not only had knowledge that Hamad had inflated the crucial enrollment figures but

23   that she had authorized and encouraged Hamad to do so.  In structuring the loan, Karl Yoder testified

24   that he had daily conversations with both Ghafur and Hamed concerning the "need for the funding,

25   about the timing of the funding, and about the [student] population count." See Reporter's Transcript

26   ("RT") at 3190.  Additionally, Yoder testified that in September of 2001, Hamed provided him with

27   actual student enrollment figures which indicated 1352 students were actually enrolled at the school

28   for the fall of 2001 when the verified figures were substantially less.  See RT at 3185-3186, 3188-90,

3198, 6071, 6243.  Though Hamed denied providing the inflated figures to Yoder, he also testified he *may* have sent a fax to Yoder in September of 2001, but it was protocol for all outgoing correspondence to be reviewed by Ghafur prior to being sent.  See RT 6060, 6067-68, 6071.  Further, according to the testimony of Islah Abdul-Hafeez, Ghafur had told Hamed to do "whatever was necessary to get the loan."  See RT 3878-79.  Finally, school board meeting minutes for October 2, 2001 indicated actual enrollment figures of 1400 students were discussed and the minutes indicate that both Ghafur and Hamed were present.  See RT 6341-43.  Of those present at the meeting, only Hamed and Ghafur would have had access to the actual enrollment figures.  See RT 6343.  While evidence produced at the trial also supported a finding of not guilty, such evidence is immaterial as the Jackson standard of review presumes the trier of fact resolved all conflicts of evidence in favor of the prosecution.  Jackson, 443 U.S. at 326.  In light of the substantial evidence presented at trial, the Court finds Petitioner is not entitled to relief on this ground.

**B.      Ground Two: Trial Court's Failure to Provide Jury Instructions**

Petitioner argues the trial court erred in refusing to provide jury instructions to define the phrase "common scheme or plan" as utilized in Penal Code § 12022.6, (Special Allegations Nos. 3 and 4).

With regards to these enhancement allegations, the jury was instructed as follows:

'And Special Allegation Number 3.  If you find Ms. Ghafur guilty of any of the crimes charged in counts one through eleven, you must then decide whether the People have proved the additional allegation that the value of the property taken was more than $50,000.'

'To prove this allegation, the People must prove that, one, in the commission of the crime, the defendant took property; two, . . . when the defendant acted, she intended to take the property; and, three, the loss caused by the defendant's taking the property was greater than $50,000.'

'. . . If you find Ms. Ghafur guilty of more than one crime, you may add together the loss from each crime to determine whether the total loss from all the crimes was more than $50,000. If the People prove that, (a), Ms. Ghafur intended to and did take property in each crime, and (b), each crime arose from a common scheme or plan.'

See Resp't Lodged 1 at 26.

The instructions provided for special allegation No. 4 were identical except that the $50,000 loss was increased to reflect $150,000.  See Resp't Lodged 1 at 26.

1        During the jury instruction conference, Petitioner objected to these instructions as they failed

2  to define "common scheme or plan" as used in the section 12022.6 enhancement allegation.  <u>See</u>

3  Resp't Lodged 1 at 27.  However, the trial court refused Petitioner's request to define the phrase.  <u>Id.</u>

4  During deliberations, the jury "did not seek any clarification or guidance with respect to the meaning

5  of "common scheme or plan."  <u>Id.</u>

6        On direct appeal Petitioner argued that because "common scheme or plan" had "distinct,

7  technical meaning," the trial court had erred in failing to define the phrase  <u>See</u> Resp't Lodged 1 at

8  28.  According to Petitioner, the phrase was "distinct" because the phrase was also used in California

9  Evidence Code Section 1101.  <u>See</u> Resp't Lodged 1 at 28.  In support of her contention, Petitioner

10  relied on <u>People v. Ewoldt</u>, 7 Cal.4th 380 (1994) which addressed Section 1101 and the admission of

11  evidence of a "common scheme or plan" in proof of the charged offense.  <u>People v. Ewoldt</u>, 7

12  Cal.4th 380, 401-02; <u>see also</u> Cal. Evid.Code § 1101.  However, the Court of Appeal rejected

13  Petitioner's contentions and instead found the phrase "common scheme or plan" (as used in section

14  12022.6) was within the jurors' common understanding.  <u>See</u> Resp't Lodged 1 at 28-29.  Citing to

15  <u>Ewoldt</u>, the Court of Appeal stated:

16        <u>Ewoldt</u> states: '[I]n establishing a common design or plan, evidence of uncharged
         misconduct must demonstrate 'not merely a similarity in the results, but such a
17       concurrence of common features that the various acts are naturally to be explained as
         caused by a general plan of which they are the individual manifestations.' . . . 'To
18       establish the existence of a common design or plan, the common features must
         indicate the existence of a plan rather than a series of similar spontaneous acts . . . .'  ¶
19       *We see no difference between the dictionary meaning and the usage of the term in*
         <u>*Ewoldt*</u>. The touchstone is whether the acts are pursuant to a plan, or merely random
20       or spontaneous. The phrase "common scheme or plan," as used in everyday, nonlegal
         parlance, conveys this meaning.
21

22  <u>See</u> Resp't Lodged 1 at 28 (italics added).

23        In sum, the Court of Appeal found that the phrase "common scheme or plan," as used in

24  section 12022.6, was within the common understanding of jurors.  <u>See</u> Resp't Lodged 1 at 29.  The

25  failure to specifically define it was therefore not error and, even assuming it was, the error was

26  harmless.  <u>See</u> Resp't Lodged 1 at 29.  The Court finds the Court of Appeal's rejection of

27  Petitioner's claim regarding the instruction was not objectively unreasonable.

28        To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

1   ailing instruction by itself so infected the entire trial that the resulting conviction violated due

2   process.  Estelle v. McGuire, 502 U.S. 62, 72 (1991); Clark v. Brown, 450 F.3d 898, 904 (9th Cir.

3   2006), cert. denied, 549 U.S. 1027 (2006).  The instruction may not be judged in artificial isolation,

4   but must be considered in the context of the instructions as a whole and the trial record. Estelle v.

5   McGuire, 502 U.S. at 72.  Furthermore, even if it is determined that the instruction violated due

6   process, a petitioner can only obtain relief if the instruction "had substantial and injurious effect or

7   influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

8   (quoting Kotteakos v. United States, 328 U.S. 750, 776, (1946)).

9       Petitioner claim that her due process rights were violated by virtue of the exclusion of the

10   special definition of "common scheme or plan" lacks merit for at least two reasons.  First, as the

11   Court of Appeals analysis correctly found, the phrase "common scheme or plan" as used in section

12   12022.6 is commonly understood and the record reflects no indication of the jury's need for further

13   instruction regarding the phrase.  See U.S. v. Hernandez-Escarsega, 886 F.2d 1560, 1571-72 (9th

14   Cir.1989) (stating that no special definition is needed for words and phrases in statutes unless they

15   are outside the common understanding of jurors, technical, or ambiguous).

16       Second, even assuming the existence of some constitutional error, the instructions as given

17   did not so infect the entire trial that the resulting conviction violated due process.  The undersigned

18   agrees with the Court of Appeal's finding there was ample evidence that Petitioner, in committing

19   the various charged offenses, had done so in pursuit of an unlawful "common scheme or plan"

20   accomplished for personal gain.  See Resp't Lodged 1 at 29.  Petitioner's plan included the use of

21   public funds to pay her "personal debts and obligations" which included (but was not limited to)

22   debts related to: (1) Petitioner's purchase of real property, (ie. her personal residence); and (2)

23   Petitioner's auto loan obtained through Cosomopolitan Finance to finance the purchase of her

24   personal vehicle.  See Resp't Lodged 1 at 5-6.  Further, testimony of investigative auditor, Edward

25   Hudson, confirmed these payments were made with public funds.  See RT 4640, 4643-44, 4658-60.

26   In light of the compelling evidence against her, Petitioner has not shown that the trial court's failure

27   to specially define the challenged phrase had a substantial and injurious effect or influence in

28   determining the jury's verdict.  Accordingly, any alleged error in the instructions was harmless under

1  Brecht.

2      **C.      Ground Three:  Removal of a Minority Juror**

3          Petitioner claims that the trial court erred in failing to find "that a prima facie case of

4  discrimination was shown by the Prosecution's exercise of a peremptory challenge to excuse the only

5  African-American juror seated . . . ."  See P&A in Support of Petition (Doc. 2) at p. 33.

6          A prosecutor's discriminatory use of peremptory challenges on the basis of race violates the

7  equal protection clause of the United States Constitution.  Miller-El v. Dretke, 545 U.S. 231, 237-40

8  (2005); Batson v. Kentucky, 476 U.S. 79, 89 (1986).  Indeed, "the 'Constitution forbids striking even

9  a single prospective juror for a discriminatory purpose.'"  Williams v. Runnels, 432 F.3d 1102, 1107

10  (9th Cir. 2006) (quoting United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994), cert.

11  denied, 513 U.S. 891 (1994)); Snyder v. Louisiana, 552 U.S. 472, 478 (2008).

12          "Batson provides a three-step process for a trial court to use in adjudicating a claim that a

13  peremptory challenge was based on race."  Snyder, 552 U.S. at 476, (internal quotation marks and

14  citations omitted); Batson, 476 U.S. at 96-98.  "First, the trial court must determine whether the

15  defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on

16  the basis of race."  Rice v. Collins, 546 U.S. 333, 338 (2006); Batson, 476 U.S. at 96-97.  "Second,

17  once the defendant has made out a prima facie case, the 'burden shifts to the State to explain

18  adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes."

19  Johnson v. California, 545 U.S. 162, 168 (2005) (quoting Batson, 476 U.S. at 94); Snyder, 552 U.S.

20  at 476-77.  "Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . .

21  whether the opponent of the strike has proved purposeful racial discrimination.'"  Johnson, 545 U.S.

22  at 168 (quoting Elem, 514 U.S. at 767); Batson, 476 U.S. at 98.  "This final step involves evaluating

23  'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of

24  persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'"

25  Collins, 546 U.S. at 338 (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)).

26          In addition to contending that she had demonstrated the required prima facie showing,

27  Petitioner argues the trial court erred in requiring heightened standards for the showing by:  (1)

28  requiring a "reasonable" inference of discrimination as opposed to lessor showing of a "mere

1  inference"; and (2) finding "a pattern of discriminatory strikes" was a prerequisite to the prima facie

2  showing.  See P&A in Support of Petition (Doc. 2) at p. 34-36.  The Court notes that in reviewing a

3  Petitioner's habeas claims, the state trial court rulings are not examined directly if, as is the case

4  here, a higher court has issued a reasoned decision on direct appeal.  Barker v. Fleming, 423 F.3d

5  1085, 1091 (9th Cir. 2005).  Rather, the Court must analyze the last reasoned decision, namely that

6  of the California Court of Appeal to determine whether its denial of Petitioner's claim was contrary

7  to or involved an unreasonable application of clearly established federal law.  Bailey v. Rae, 339

8  F.3d 1107, 1112-13 (9th Cir. 2003).  As discussed below, the Court of Appeals properly denied

9  Petitioner's claim.

10     To establish a prima facie case of racial discrimination in jury selection, Petitioner must show

11  that (1) the removed prospective juror is a member of a cognizable group; (2) the prosecution

12  exercised a peremptory challenge to remove the juror; and (3) "the facts and any other relevant

13  circumstances raise an inference" that the challenge was racially motivated.  Batson, 476 U.S. at 96.

14  The first two elements are undisputed in Petitioner's case because the prosecutor used a peremptory

15  challenge to remove F.C., an African American woman, from the jury pool.  See RT at 111.

16     For the third element, the court of appeals reasonably concluded that the facts presented at

17  trial did not raise an inference that the prosecutor's challenge was racially motivated.  The Court of

18  Appeals stated:

19     "'[W]e have reviewed the record and, like the United States Supreme Court in
    Johnson . . .  [we] are able to apply the high court's standard and resolve the legal
20     question whether the record supports an inference that the prosecutor excused a juror
    on the basis of race.' [Citation.]"

21
        We find no such inference here.  Although the establishment of a prima facie
22     case does not depend on the number of prospective jurors challenged (see People v.
    Moss (1986) 188 Cal.App.3d 268, 277), as "[t]he exclusion by peremptory challenge
23     of a single juror on the basis of race or ethnicity is an error of constitutional
    magnitude" (People v. Silva (2001) 25 Cal.4th 345, 386, italics added), the requisite
24     showing is not made merely by establishing the excused prospective juror was a
    member of a cognizable group. [Citations].

25
        . . . Although circumstances may be imagined in which a prima facie case
26     could be shown on the basis of a single excusal, in the ordinary case, including this
    one, to make a prima facie case after the excusal of only one or two members of a
27     group is very difficult. [Citation.]"  (Id. at p. 598, fn. 3.)  The fact F.C. was the only
    African-American prospective juror to have been considered at the time of her
28     removal is not dispositive (People v. Guerra, supra, 37 Cal.4th at p. 1101; see People

1    v. Williams (2006) 40 Cal.4th 287, 311); as we have noted, the trial jury included an
     African-American, which circumstance, while similarly not conclusive, weighs
2    against the finding of a prima facie case. [Citations].

3        Moreover, the record discloses reasons other than racial or group bias for a
     prosecutor to challenge F.C.  Her answers, whether curt and abrupt or not, certainly
4    may properly be characterized as short and practically monosyllabic.  This reasonably
     could have raised red flags in the prosecutor's mind concerning her attitude toward
5    court proceedings in general or this case in particular.  More importantly, this was a
     complicated case.  Any prosecutor reasonably could have believed, given the
6    complexity of the evidence, that someone who had never been employed outside the
     home would not be a desirable juror.

7
         . . . [W]e have concluded that the evidence alluded to by defendant in the trial
8    court did not support such an inference, nor was such an inference supported by the
     challenged juror's own statements or anything else in ' "the totality of the relevant
9    facts" ' [citation] that we have seen in our examination of the record. . . ." [Citation].

10   See Resp't Lodged 1 at 21-22 (footnotes omited).

11       The Court of Appeals applied the correct "raise an inference" standard in determining

12   whether Petitioner established a prima facie case of prosecutorial discrimination.  Thus the Court of

13   Appeals determination is entitled to a "presumption of correctness" on federal habeas review.

14   Fernandez v. Roe, 286 F.3d 1073, 1077 (9th Cir.), cert. denied, 537 U.S. 1000 (2002); Wade v.

15   Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).

16       In determining whether the party challenging the peremptory strike has succeeded at step one

17   of the Batson test, a reviewing court "must consider the totality of relevant circumstances."  Tolbert,

18   190 F.3d 985, 988 (9th Cir. 1999); Boyd v. Newland, 467 F.3d 1139, 1146-47 (9th Cir. 2006).  One

19   method courts may assess that the party challenging the strike has shown an inference of

20   discrimination is "comparative juror analysis."  Boyd, 467 F.3d at 1147-49 (stating that "comparative

21   juror analysis is an important tool that courts should use on appeal"); see also Crittenden v. Ayers,

22   624 F.3d 943, 956 (9th Cir. 2010) ("[C]omparative juror analysis may be employed at step one to

23   determine whether the petitioner has established a prima facie case of discrimination."); see also

24   United States v. Collins, 551 F.3d 914, 921 (9th Cir. 2009) ("Comparative juror analysis involves

25   comparing the characteristics of a struck juror with the characteristics of other potential jurors

26   particularly those jurors whom the prosecutor did not strike").

27       Here the record suggests that a comparison of Petitioner's characteristics to those

28   characteristics of other jurors weighs against Petitioner's claim.  Responding to the Prosecutor's

1  questions, F.C. indicated that she had not worked outside the home as she stated she was a "stay-at-

2  home-mom." See RT at 37-38.  However as noted by the Court of Appeal, "it appears all jurors

3  [who were ultimately selected for trial] had at least some employment or business experience" and

4  that the Prosecutor had exercised his second peremptory challenge against a prospective juror who

5  had also been a homemaker. See Resp't Lodged 1 at 22, fn. 33.  Thus it cannot be said that this case

6  is one where "two or more potential jurors share[d] the same relevant attributes (here, the absence of

7  work experience) but the prosecutor . . . challenged only the minority juror." Collins, 551 F. 3d at

8  922.  Moreover, as the Court of Appeals stated: "any prosecutor reasonably could have believed,

9  given the complexity of the evidence, that someone who had never been employed outside the home

10  would not be a desirable juror." See Resp't Lodged 1 at 22.

11        Apart from her contentions regarding the trial court's error, Petitioner's claim rests solely on

12  the fact that F.C. was the only black prospective juror and the prosecutor exercised a peremptory

13  challenge against her.  However, this is insufficient to raise an inference of discrimination. Wade,

14  202 F.3d at 1198; Tolbert, 190 F.3d at 988.  "[T]he striking of one juror of a cognizable racial group

15  does not by itself raise an inference of discriminatory purpose." Tolbert, 190 F.3d at 988; Wade, 202

16  F.3d at 1198 (quoting Vasquez-Lopez, 22 F.3d at 902 and stating "'[T]he fact that the juror was the

17  one Black member of the venire does not, in itself, raise an inference of discrimination'").

18        Accordingly, the California Court of Appeal's finding that Petitioner had not raised the

19  inference that the prosecutor had excused the juror on the basis of race was neither contrary to, nor

20  an unreasonable application of, clearly established federal law.

21

22                                     **RECOMMENDATION**

23  Accordingly, the Court RECOMMENDS that:

24  1.       The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and

25  2.       The Clerk of the Court be DIRECTED to enter Judgment for Respondent; and

26  3.       A Certificate of Appealability be DENIED.

27

28  This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

1   States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of

2   the Local Rules of Practice for the United States District Court, Eastern District of California.

3   Within thirty (30) days after being served with a copy, any party may file written objections with the

4   court and serve a copy on all parties.  Such a document should be captioned "Objections to

5   Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

6   filed within fourteen (14) court days after service of the objections.  The Court will then review the

7   Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to

8   file objections within the specified time may waive the right to appeal the District Court's order.

9   Martinez v. Ylst, 951 F.2d 1153 (9th Cir.1991).

10

11   IT IS SO ORDERED.

12   **Dated:   February 8, 2011          /s/ John M. Dixon**
                                    UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28